

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. 0306-14

### THE STATE OF TEXAS

**v.**

### DAVID VILLARREAL, Appellee

#### ON STATE'S MOTION FOR REHEARING
#### FROM THE THIRTEENTH COURT OF APPEALS
#### NUECES COUNTY

**NEWELL, J. filed a concurring opinion.**

### O P I N I O N

In any case involving the Fourth Amendment, I believe the exceptions to the warrant requirement should be carefully considered and only extended based on a proper reasonableness analysis. And if we are to recognize a new exception to the warrant requirement, we should not employ a totality-of-the exceptions approach that picks among the desired qualities of established exceptions while discarding the rationales that justify those exceptions. Instead, we should employ a proper Fourth Amendment balancing test that

weighs the State's interest in the detection and prevention of crime against an individual's privacy interest in his own blood. As the original majority opinion correctly holds, under a proper Fourth Amendment balancing test, a *per se* warrantless blood draw is not permissible based upon the criminal status of the subject and the dissipation of alcohol from his bloodstream.[1] This is why I join the order dismissing the State's motion for rehearing as improvidently granted and agree with the original majority opinion.

Fourth Amendment analysis of warrantless searches rests heavily on a simple notion: "It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991).[2] These exceptions have been established by engaging in a balancing test in which legitimate government interests are weighed against the individual's expectation of privacy. *See, e.g. Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). However, the United States Supreme Court, in conducting that inquiry, has repeatedly cautioned that "[t]here is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *Ker v. California*, 374 U.S.

---

[1] It is worth noting that no member of this Court appears to argue that the warrantless search for and seizure of blood in this case was justified under an established exception to the warrant requirement. Rather, the proponents of the search and seizure in this case seem to rely upon the general Fourth amendment balancing test to recognize a new exception to the search warrant requirement, or perhaps an extension of the existing exigent-circumstances exception.

[2] Established exceptions to the warrant requirement include the consent exception, the exigent-circumstances exception, the automobile exception, the search-incident-to-arrest exception, and the special-needs doctrine.

23, 33 (1963) (plurality opinion) (citations and quotations omitted).

### *Per Se* Rules Are Strongly Disfavored Under the Fourth Amendment

As the United States Supreme Court has repeatedly realized, *per se* rules are incompatible with the Fourth Amendment's protection and respect for an individual's right to be free from unreasonable searches. *United States v. Drayton*, 536 U.S. 194, 201 (2002) ("[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context."); *Florida v. Royer*, 460 U.S. 491 (1983) (expressly disavowing any "litmus-paper test" or single "sentence or . . . paragraph . . . rule," in recognition of the "endless variations in the facts and circumstances" implicating the Fourth Amendment); *Michigan v. Chesternut*, 486 U.S. 567, 572-573 (1988) (rejecting bright-line rule urged by the parties as contrary to the "traditional contextual approach"); *Florida v. Bostick*, 501 U.S. 429 (1991) (rejecting a *per se* rule adopted by the Florida Supreme Court). "While the desire for a bright-line rule is understandable, the Fourth Amendment [does] not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Missouri v. McNeely*, 133 S. Ct. 1552, 1564 (2013) (plurality op.).

In *Missouri v. McNeely*, the Supreme Court reiterated its rejection of *per se* rules in the context of the warrantless search and seizure of blood by declining to recognize a *per se* exigency claim based upon the destruction of alcohol evidence in a DWI defendant's bloodstream. 133 S.Ct. at 1563 ("In short, while the natural dissipation of alcohol may

support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically."). The Court had granted review to resolve a split of authority on the question of whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations. *McNeely*, 133 S.Ct. at 1558. The Court rejected this *per se* exigency claim, not only on the basis of its own history of disinclination towards *per se* rules, but also because the record failed to establish any exigency beyond the dissipation of alcohol attendant to any DWI case. *Id.* at 1567.

A plurality of the Court expressed its concern that a *per se* rule that "categorically authorizes warrantless blood draws" on a particular basis would "discourage efforts to expedite the warrant process." *Id.* at 1563. Leading the plurality, Justice Sotomayor observed that "the Fourth Amendment [does] not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Id.* at 1564. And the plurality opinion pointed to widespread state statutory restrictions upon nonconsensual blood testing without a warrant as support for the proposition that compelled blood draws implicate a significant privacy interest. *Id.* at 1567.

Justice Kennedy did not join this portion of the Supreme Court's opinion, writing instead to note the limited nature of the Court's holding. He observed that states and other governmental entities that enforce driving laws can adopt rules, procedures, and protocols

that meet the reasonableness requirements of the Fourth Amendment and give helpful guidance to law enforcement officials. *Id*. at 1569 (Kennedy, J. concurring). Of course, he gave no hint as to what such rules, procedures, or protocols might be.[3] And, he did not join the concurring and dissenting opinion authored by Chief Justice Roberts, which proposed a bright-line rule based upon the exigency attendant to the natural dissipation of alcohol and a showing that there was no time to secure a search warrant. *Id*. at 1568. At most, Justice Kennedy agreed with eight other members of the Court that the natural elimination of alcohol from a suspect's bloodstream was an exigent circumstance, but that circumstance alone did not justify a *per se* rule dispensing with the warrant requirement itself. *Id*. at 1569.

## The Warrant Requirement and its Exceptions

Given the constitutional antipathy for *per se* rules and the affinity for a proper balancing test of the interests involved, I agree with the original majority opinion that Texas Transportation Code § 724.012(b)(3)(B) does not create a *per se* rule that a minimum number of prior offenses justifies a warrantless blood draw when coupled with the natural dissipation of alcohol in a suspect's blood stream. The Fourth Amendment requirement that a search warrant be secured from a neutral magistrate before carrying out a search is not officious formalism. As the Supreme Court explained in *Johnson v. United States*, 333 U.S. 10, 13-14

---

[3]This is hardly an earth-shattering observation on the part of Justice Kennedy that states or governmental entities can pass laws consistent with the Fourth Amendment. We have recognized as much in other contexts. *See e.g. Hudson v. State*, 662 S.W.2d 957, 960 (Tex. Crim. App. 1984) (noting that article 15.25 of the Code of Criminal Procedure must be interpreted consistently with the Supreme Court rulings on the Fourth Amendment). But I do not read into Justice Kenndy's explicit refusal to reach the issue any implication that he would decide the issue in a particular way (much less his approval of the Texas statute at issue in this case).

(1948):

> The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime...is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

The mere fact that the warrant may seem like an unnecessary, additional step does not sufficiently justify abandoning the constitutional safeguard of a prior determination of probable cause by a neutral magistrate. It is a requirement subject only to certain, well-establish exceptions.

To be clear, these exceptions are established independent of one another. We should not craft an entirely new exception by mashing up all the existing exceptions and picking and choosing from their most attractive qualities. Each exception to the warrant requirement has an individual rationale behind it. Searches incident to arrest are justified based on the interest of officer safety, the prevention of escape, and the destruction of evidence. *See Chimel v. California*, 395 U.S. 752 (1969). The automobile exception was established because historically there is a lower expectation of privacy in the interior of motor vehicles as well

as an inherent exigency in the automobile's mobility. *See Carroll v. United States*, 267 U.S. 132 (1925). The exigent circumstances exception concerns the imminent destruction of evidence and the inability of law enforcement to obtain a warrant. *See McNeely*, 133 S.Ct. at 1558-559 (listing variety of circumstances giving rise to exigency, but noting that, under each type of circumstance, a warrantless search is justified because there is a compelling need for official action and no time to secure a warrant).

All of these exceptions involve varying government interests and differing levels of privacy interests. Yet, none of the exceptions to the warrant requirement are interchangeable in their basic principles. Therefore, we should not sanction a rule in which an impermissible warrantless search that cannot satisfy the automobile exception,[4] the search-incident-to-arrest exception,[5] the exigent-circumstances exception,[6] or the hot-pursuit exception[7] somehow equals a permissible warrantless search when all those exceptions are added together because the defendant has a minimum number of DWI offenses and the alcohol in his blood is naturally dissipating. This unprecedented totality-of-the-exceptions approach adds zeros to create one, ignoring that the exceptions to the Fourth Amendment warrant requirement "have been jealously and carefully drawn." *Hudson v. State*, 588 S.W.2d 348, 351 (Tex. Crim. App.

---

[4] *Wyoming v. Houghton*, 526 U.S. 295 (1999).

[5] *Riley v. California*, 134 S. Ct. 2473 (2014).

[6] *McNeely*, 133 S. Ct. at 1566.

[7] *Welsh v. Wisconsin*, 466 U.S. 740 (1984).

1979) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). We cannot Frankenstein them into an entirely new exception that would consume its predecessors.

In other words, although a balancing approach to Fourth Amendment analysis is permitted, it should not be at the sacrifice of other carefully delineated exceptions to the warrant requirement or the warrant requirement itself lest the balancing-test exception swallow the whole rule. Instead, it is in keeping with the notion that a search is presumptively valid with a warrant even though there are certain circumstances, particularly where legitimate government interests abound, when an exception may validate a search done without a warrant. *See New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985) ("The determination of the standard of reasonableness *governing any specific class of searches* requires balancing the need to search against the invasion which the search entails.") (emphasis added). As the original majority opinion correctly notes, the Supreme Court has recently made very clear that, "in the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley*, 134 S.Ct. at 2482; *McNeely*, 133 S.Ct. at 1558 ("[A] search of a person is reasonable only if it falls within a recognized exception [to the warrant requirement]"); *see also Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011) (noting that a warrant must generally be secured subject to certain reasonable exceptions). I join the majority in returning to our original opinion in this case because I cannot support the creation of a new exception to the warrant requirement where the search at issue is not supported by any of the rationales underlying the carefully

delineated exceptions to the warrant requirement set out by the Supreme Court.

## Appellee's Privacy Interest Is Not Diminished

The individual's right to be free from an "invasion of bodily integrity" is obvious and substantial. *McNeely*, 133 S. Ct. at 1558. Just as no one can deny that drunk driving is a scourge upon our roadways, nor can they deny the fact that the government's intrusions beyond the body's surface "implicate most personal and deep-rooted expectations of privacy." *McNeely*, 133 S. Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)). The Supreme Court made clear in *Schmerber v. California*, that the Fourth Amendment forbids any such intrusions "on the mere chance that desired evidence might be obtained." 384 U.S. 757, 769-70 (1966). Under the plain text of the Fourth Amendment, a person's right to be free from a search of his or her body is "first among equals." U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasoanble searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

Villarreal's "privacy interest in preventing an agent of the government from piercing his skin," cannot be minimized to that of a probationer or parolee based on the fact that he has prior offenses. *McNeely*, 133 S.Ct. at 1565. As we correctly noted in our original opinion, parolees are in the legal custody of the State and, therefore, cannot enjoy the privacy rights of a general citizen. One's status as a probationer or parolee is "salient" and, by virtue

of that status, neither "enjoy[s] the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)); *see also Samson v. California*, 547 U.S. 843, 848 (2006). The Supreme Court has noted that both parolees and probationers are on the "continuum" of state-imposed punishments thereby allowing for diminished privacy rights much like a prisoner has. *Samson*, 547 U.S. at 850. Additionally, while recidivism is certainly the State's concern in the context of probationers and parolees, so too is rehabilitation.[8] Thus, diminished privacy rights are justifiable given the interest in providing "restrictions...meant to assure that the probation serves as a period of genuine rehabilitation." *Griffin*, 483 U.S. at 875; *see also Knights*, 534 U.S. at 119; *see also Samson*, 547 U.S. at 853.

The circumstances that justify a diminished privacy right in probationers and parolees are not present in cases that involve repeat offenders like Villarreal. Repeat offenders are not part of that punishment continuum expressed in *Samson* nor are they subject to the same restrictions placed on prisoners, parolees or probationers. There is no supervisory or custodial relationship between the State and a person with prior convictions. *See also Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995) (noting the legal and supervisory relationship between the student at the State and comparing it to that of probationers before explaining the student's diminished expectation of privacy). As such, they have the same privacy interest in their bodily integrity as any other person. Notably, the

---

[8] Labeling such drivers "incorrigible" seems to make this point clear. By definition, incorrigible means "Incapable of being corrected, reformed, amended, or improved." BLACK'S LAW DICTIONARY (6th ed. 1991).

Supreme Court appears to agree given that it has not considered a defendant's status as a repeat offender (as opposed to the nature and circumstances of the offense) when determining the extent of his privacy rights under a Fourth Amendment balancing test. *See e.g., McNeely*, 133 S. Ct. at 1557, n. 1; *Welsh v. Wisconsin*, 466 U.S. 740, 746, n. 6 (1984); *Riley v. California*, 134 S. Ct. 2473, 2482 (2014).

The concern over recidivism is also no justification for a holding that a minimum number of prior offenses is sufficient, on its own, to justify a warrantless blood draw. Although I acknowledge the recidivism rate of repeat offenders such as Villarreal and others like him, nothing in our jurisprudence allows for the likelihood of one's relapse into a life of criminal activity to dictate whether they are subject to the protections of the Fourth Amendment. Instead, this consideration has its proper place, if anywhere, in the totality of the circumstances analysis. *Knights*, 534 U.S. at 118, 120 (When considering the "totality of the circumstances" to decide whether the warrantless search of a probationer's apartment violated the Constitution, the Supreme Court, among other things, took into account the high recidivism rate of probationers.).

Accepting the notion that recidivism justifies *per se* warrantless searches would have far-reaching effects as well as unintended consequences. For example, it is reasonable to believe that repeat offenders of sexual assaults are at high risk of re-offending. Does this recidivist threat justify conducting a warrantless search of an offender's home whenever an

officer feels he has probable cause that a crime has been committed?[9] Does the passage of time help the recidivist regain his or her expectation of privacy? Moreover, I do not see how this recidivism theory is limited to a showing of two prior DWI convictions when it rests upon statistics regarding the likelihood that a person who belongs to a particular class would commit a crime in the future. If the legislature can designate one class of person as deserving of less privacy based upon a statistical likelihood to commit a crime, what is to stop them from designating other classes of individuals worthy of a warrantless search based upon a statistical propensity for violence? In my view, it is more prudent to interpret the holdings in *Knights* and *Samson* consistently with the rationales that justified the searches at issue in those cases in light of these considerations.

Even though the Supreme Court has recognized the seriousness of an offense as an exigent circumstance worthy of consideration under a totality-of-the-circumstances analysis, it has refused to convert that exigent circumstance into a *per se* rule justifying a warrantless search. In *Welsh v. Wisconsin*, the Supreme Court considered the nature of the underlying offense to be "an important factor to be considered." 466 U.S. 740, 751 (1984). It did so, however, in the context of the "exigent-circumstances calculus." *Id*. And then, even in that context, the Court made clear that "no exigency is created simply because there is probable

---

[9] Certainly, probable cause could be used to obtain a warrant but merely the existence of prior convictions would not, on its own, support a warrantless search under one of the exceptions to the warrant requirement. *See Parker v. State*, 206 S.W.3d 593, 597 (Tex. Crim. App. 2006) (noting that there are two hurdles an officer must pass to justify warrantless entry into the home. "Probable cause...is the first hurdle...[t]he second hurdle is that exigent circumstances...must also exist. If either probable cause or exigent circumstances are not established, a warrantless entry [into the home] will not pass muster under the Fourth Amendment.").

cause to believe that a serious crime has been committed." *Id.* at 753. Nothing in *Welsh* suggests or even implies that a more "serious" offense validates a *per se* exception to the warrant requirement. To the contrary, the Court made clear that its skepticism regarding whether a "minor offense" would ever be a factor in the exigent-circumstances calculus should not be construed as an endorsement a *per se* exigency rule where a "serious crime" is involved. Rather than imply a new exception to a warrantless search, the Court limited *Welsh* to a traditional, exigent-circumstances analysis. And reading *Welsh* as elevating the gravity of the offense to a singularly determinative factor would be inconsistent with subsequent opinions by the Supreme Court admonishing lower courts for reading *Welsh* "far too broadly" and restating that its opinion went to a much more limited point that "warrantless entry to arrest a misdemeanant...should be rare." *Stanton v. Sims*, 134 S. Ct. 3, 6-7 (2013) (citing *Welsh*, 466 U.S. at 753); *see also Illinois v. McArthur*, 531 U.S. 326, 336 (2001) (refusing to consider the underlying offense as an important factor given that the case involved temporary restriction outside the home, rather than warrantless entry into the home like in *Welsh*).

Furthermore, *Maryland v. King* does not support the claim that the defendant lacks a sufficient expectation of privacy in his body because of his arrest for a "serious" offense.[10]

---

[10] The Supreme Court does note in *King* that the arrestee subject to the buccal swab search is necessarily in valid police custody "for a serious offense supported by probable cause." *Maryland v. King*, 133 S.Ct. 1958, 1970 (2013). However, the Court also makes clear that its concern with the severity of the offense derives from the nature of the crime itself, not the status of the offender. *Id.* at 1973 (noting that the determination of bail is contingent upon "the nature and the circumstances of the offense charged"). And the Court provides links to studies that identify "preventable" felony offenses, none of which identify felony DWI as the type of "serious" offense preventable by the type of search at issue. *Id.* (citing to several studies that identify murder, rape, aggravated robbery, burglary,

In *King*, the Court considered the buccal swab procedure in the context of a search incident to an arrest during the "routine administrative procedure[s] at a police station house incident to booking and jailing the suspect." *Maryland v. King*, 133 S. Ct. 1958, 1971 (2013). According to the Court, taking and analyzing a cheek swab of the arrestee's DNA was a legitimate police booking procedure that is reasonable under the Fourth Amendment. *Id.* at 1980. But the Court took care to note that "[a] buccal swab is a far more gentle process than a venipuncture to draw blood" was of "central relevance to determining reasonableness." *Id.* at 1969. The Court made a conscious effort to create a wall between its analysis of the facts in *King* and how it had determined the reasonableness of the warrantless blood draw in *McNeely* only two months earlier.

This becomes even more clear when considering the government interest at play in *King*, which the Court described as the "need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody," rather than the gathering of evidence for future prosecution. *Id.* at 1970. The purpose of the buccal swab was not investigation; the government simply needed to ensure a "more accurate form of identifying arrestees" that allowed officers to know who they had in their jails. *Id.* at 1976; *see also id.* at 1980 (J. Scalia, dissenting) ("Whenever this Court has allowed a suspicionless search, it has insisted upon a justifying motive apart from the

aggravated kidnapping, felony assault, robbery, and sexual assault as the serious offenses that could be prevented through the use of buccal swab identification procedures). I remain unpersuaded that the reference to a "serious offense" in *King* includes felony DWI.

investigation of crime.").[11]  This interest, compared with the minimal invasion of individual privacy rights at issue in *King*, led to the conclusion that a buccal swab during the booking process was a reasonable search.  *Id.* at 1980.

But seizure of the felony DWI defendant's blood serves no interest in identification or officer safety.  Instead, the purpose of the blood draw is to engage in further investigation for the most accurate evidence of intoxication possible.  Given the Supreme Court's deliberate avoidance of using investigation as a justification for even the most minimal of bodily searches in *King*, we should not read *King* to justify a warrantless blood draw for purely investigative purposes.  Like the majority in our original opinion, I can find no rationale for extending *King* beyond the facts of that case and certainly not to the extent that it supports a warrantless blood draw based solely on the driver's criminal record.

### The State's Interest in Blood Alcohol Concentration Amounts to a General Interest in Crime Control

The government's interest in protecting the public from the dangers of drunk driving is compelling, and I do not question the legitimacy of this interest.  In *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 451 (1990), the Supreme Court noted this compelling state interest when upholding the constitutionality of DWI checkpoints.  And the Court also based its decision in *Sitz* upon the existence of both objective standards and a showing that the checkpoints themselves effectively made the roads safer because they resulted in DWI

---

[11] It is also worth noting that the majority in *King* recognized to potential for prompt DNA testing to exonerate the wrongfully imprisoned and speed up the apprehension of criminals before they commit additional crimes.  133 S.Ct. at 1974.  The warrantless blood-draw in a DWI case does not carry a similar potential.

arrests. *Id.* at 454-55.

But the Supreme Court relied upon a governmental interest apart from the investigation of crime in *Sitz*. That is why the Court later refused to expand *Sitz* to include drug-interdiction checkpoints because the primary purpose of those checkpoints was a "general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000). Notably, the Court recognized that the State's interest in stopping the trafficking of illegal narcotics was great, but it nevertheless did not find the type of close connection between the State's need to detect and prevent crime and use of the checkpoint to do so as it did in *Sitz*. *Id.* at 44-45.

The Court took this analysis a step further in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). There, the Medical University of South Carolina instituted a policy whereby pregnant mothers would be screened for cocaine use and required any mother who tested positive to comply with a substance abuse treatment program under threat of arrest. *Id.* at 72-73. In holding that this program violated the Fourth Amendment, the Court focused upon the nature of the "special need" asserted as a justification for the warrantless search. *Id.* at 79. According to the Court, "the 'special need' that was advanced as a justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement." *Id.* The Court acknowledged that the ultimate goal of the program, protecting the health of both mother and child, was a beneficent one, but still held that the purpose actually served by the search was indistinguishable from a general interest

in crime control. *Id.* at 81.

Notably, Justice Kennedy concurred to observe that the "special needs" cases had always turned upon the "ultimate goal" of the search and seizure at issue rather than the "immediate purpose" declared by the majority. *Id.* at 87 (Kennedy, J. concurring) (referencing *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989) as one example of a "special needs" case). Yet, he also acknowledged that in those cases, "[t]he traditional warrant and probable-cause requirements are waived . . . on the explicit assumption that the evidence obtained in the search was not intended to be used for law enforcement purposes." *Id.* While Justice Kennedy recognized that the hospital may have had a legitimate need unrelated to law enforcement, the program had "a penal character with a far greater connection to law enforcement than other searches sustained under our special needs rationale." *Id.* at 89. I see the same issue with the warrantless collection of blood alcohol evidence in recidivist DWI cases; there is certainly a connection between blood alcohol levels and roadway safety, but the State's interest in blood alcohol evidence, at least under current Texas law, does not advance the State's need to detect and prevent crime for the safety of those on the roadway beyond a general interest in crime control.

Under Texas law, evidence of blood alcohol concentration is not necessary to arrest or even convict a DWI driver, even one charged with felony DWI. Blood alcohol concentration is one way of proving intoxication, and a higher alcohol concentration enhances a sentence from a Class B misdemeanor to a Class A misdemeanor. TEX. PENAL

CODE ANN. § 49.01(1) (West 2013); TEX. PENAL CODE ANN. § 49.04 (West 2013). But the State can also prove intoxication by showing a particular concentration of alcohol in a driver's breath and urine or even without any showing of any particular alcohol concentration whatsoever. TEX. PENAL CODE ANN. § 49.01(2) (West 2013). Police officers can certainly arrest a suspect without a warrant when they have probable cause to believe that person has committed the offense of driving while intoxicated, but their ability to do so is not tied to either a showing of a particular blood alcohol concentration or the driver's status as a repeat offender. TEX. CODE CRIM. PROC. ANN. art. 14.03 (West 2013); *Miles v. State*, 241 S.W.3d 28, 41 (Tex. Crim. App. 2007) (noting that driving while intoxicated is an offense against the public peace).

The statutory provisions related to license suspension place some reliance upon blood alcohol concentration (as well as breath-alcohol concentration), but they are also not dependent upon that evidence to suspend even a recidivist DWI offender's driver's license. A DWI offender, even one who commits a felony DWI, can have his license suspended regardless of whether he provides or refuses to provide a specimen of blood. TEX. TRANSP. CODE ANN. § 524.011 (West 2013) (setting out officer's duty to take possession of an arrestee's driver's license upon an analysis of either a breath or blood specimen showing an alcohol concentration over the legal limit); TEX. TRANSP. CODE ANN. § 724.032 (West 2013) (setting out officer's duty to take possession of an arrestee's driver's license upon a driver's refusal to provide a requested specimen for alcohol concentration testing). Significantly, an

arresting officer must still give a temporary driver's license to the arrested DWI driver, even a repeat offender, until the Texas Department of Public Safety suspends the driver's license after receiving a report from the arresting officer regarding the results of the analysis of the breath or blood specimen. TEX. TRANSP. CODE ANN. § 524.012 (West 2013). The same requirements exist when a person refuses to submit to the taking of a specimen. TEX. TRANSP. CODE ANN. § 724.032 (West 2013). While the periods of these suspensions are increased if the driver has previously had his or her driver's license suspended, the suspension periods are not dependent upon a showing of a particular blood alcohol concentration. TEX. TRANSP. CODE ANN. § 524.022 (West 2013): TEX. TRANSP. CODE ANN. § 724.035 (West 2013).

The conditions of pre-trial release and post-conviction probation place are equally independent of any showing of blood alcohol concentration. A defendant charged with a Class A misdemeanor DWI or above is required to get an ignition interlock device installed upon his or her car as a condition of bail regardless of whether there is evidence of a particular blood alcohol concentration. TEX. CODE CRIM. PROC. ANN. art 17.441 (West 2013). After conviction, a defendant placed on community supervision may be required to have an ignition interlock device installed on his or her vehicle in an ordinary DWI case, but the installation is mandatory if he or she has been convicted of felony DWI regardless of any showing of a particular blood alcohol concentration. TEX. CODE CRIM. PROC. ANN. art. 42.12 sec. 13(I) (West 2013). A trial court is also required to order installation of an ignition

interlock device if it is shown at trial that the defendant had an alcohol concentration of 0.15 or more, but a showing of blood alcohol concentration is not required. *Id.* The period of installation is not extended based upon the defendant's status or a showing of a particular blood alcohol concentration. *Id.* And jail time required as a condition of probation for felony DWI defendants is not contingent (or extended) upon a showing of a defendant's blood alcohol concentration. TEX. CODE CRIM. PROC. ANN. art. 42.12 sec. 13(a)(1) (West 2013).

These provisions reveal a scheme designed to secure useful, even compelling evidence for trial rather than to detect intoxicated drivers through blood testing in order to prevent drunk driving accidents. Unlike the sobriety check points in *Sitz*, the governmental intrusion at issue in this case–the warrantless seizure of blood–does not further the State's compelling interest in getting drunk drivers off the road before they cause an accident beyond a general interest in law enforcement. Moreover, the seizure of this blood alcohol concentration evidence has no more impact upon the felony DWI defendant than it does a misdemeanor DWI defendant.

The State's interest in this case must be weighed in the context of the search at issue, namely the search for blood alcohol concentration evidence. *Vernonia School Dist.*, 515 U.S. at 661 (explaining that a "compelling state interest" must be considered in light of the particular search at hand). To be constitutionally valid, the "primary purpose" of the warrantless search has to serve more than a general interest in crime control. *City of Los*

*Angeles, Calif. v. Patel*, 135 S.Ct. 2443, 2452 (2015). And while the State has a compelling interest in keeping the public safe from drunk drivers, the search for and seizure of blood alcohol evidence in this case merely furthers the State's general interest in crime control. *Ferguson*, 532 U.S. at 82-84 ("While the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence *for law enforcement purposes* in order to reach that goal."); *see also Edmonds*, 531 U.S. at 44. And to the extent that one would argue that *Skinner v. Railway Labor Executives' Assn.* supports the warrantless search in cases like the one before us, the Supreme Court has made clear that *Skinner* was justified upon a rationale beyond the normal need for law enforcement. *Skinner*, 489 U.S. at 620. Like the majority in our original opinion in this case, I cannot apply these "special needs" cases to circumstances that do not serve the underlying rationale that permitted the searches in those cases.

### Driving is not a "Closely Regulated Industry"

For similar reasons, I cannot agree that the search at issue in this case has all the hallmarks of an administrative search of a closely regulated industry, assuming that such searches are distinct from "special needs" searches. The Supreme Court has held that administrative searches by municipal health and safety inspectors require a search warrant even though the State has an interest in preventing the unintentional development of conditions which are hazardous to the public health and safety. *Camara v. Municipal Court*

*and City and County of San Francisco*, 387 U.S. 523, 535-36 (1967). While the Court allowed for the need for inspectors to search a residence without a warrant to maintain code compliance, it nevertheless refused to sanction warrantless inspections unless the State could demonstrate that the warrant requirement would frustrate the State's regulatory goals. *Id.* at 533. According to the Court, in the context of administrative searches, "the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Id*. (citing *Schmerber*, *supra*, 384 U.S. at 770-71).

But the Supreme Court has allowed administrative inspections of a closely regulated industry. *New York v. Burger*, 482 U.S. 691, 702 (1987). Such searches are premised upon the theory that the owner or operator of a commercial premises in a "closely regulated" industry has a reduced expectation of privacy. *Id.* Moreover, such searches must meet three criteria: (1) a showing of a substantial governmental interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspection must be necessary to further the regulatory scheme; and (3) the certain and regular application of the inspection must provide a constitutionally adequate substitute for a warrant. *Id.* at 702-03.

Here, the felony DWI defendant is not a part of a "closely regulated industry" by driving. So far, the Court has only recognized four industries that have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor

over the stock of such an enterprise. *Patel*, 135 S.Ct. at 2454 (observing that liquor sales, firearms dealing, mining, and running a junkyard are the only industries recognized by the Court as "closely regulated"). Driving is not one of them. And as discussed above, the felony DWI defendant does not have a lessened expectation of privacy by virtue of his status, so any analogy between a citizen driver to a private business owner of a closely regulated industry necessarily fails at the outset.

Even assuming that the analogy is viable, the search at issue in this case is not necessary to further the regulatory scheme. As discussed above, none of the regulations attendant to multiple DWI convictions are tied to the blood test results themselves. And, as with the "special needs" cases, the search at issue only furthers the State's general interest in crime control rather than some interest in licensing drivers. Suggesting that the search in this case has all the hallmarks of an administrative search is like saying an elephant seal has all the hallmarks of an elephant.

## Like *McNeely*, This Opinion is Narrow

Despite all the gnashing of teeth and rending of garments that may follow this Court's adherence to its original majority opinion, it is important to note the limited nature of the holding. We did not hold that police could never obtain blood alcohol evidence from DWI defendants, even the most incorrigible ones. Neither did we hold that police must always secure a search warrant to do so. We simply held that the status of a driver suspected of driving while intoxicated coupled with the natural dissipation of alcohol from his blood does

not, by itself, justify a warrantless search and seizure.  Like the Supreme Court in *McNeely*, we did not foreclose the possibility that a warrantless search and seizure of a felony DWI driver's blood could be justified upon a showing of exigent circumstances, or another exception to the warrant requirement.  But the State has not made such a showing in this case.  It simply pointed to the statute, just as the State did in *McNeely*.

I join the majority's order dismissing the State's motion for rehearing as improvidently granted.  And I agree with the original majority opinion because I cannot support a holding that a felony DWI defendant has a greater expectation of privacy in the contents of his cell phone than his own blood.  With these thoughts, I concur.


Filed: December 16, 2015

Publish